

FILED
CLERK, U.S. DISTRICT COURT
11/29/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_JB\_\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 2:21-cr-00540-SB |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 666(a)(1)(B): Bribery Concerning Programs Receiving Federal Funds; 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| PAUL O. PARADIS, | |
| Defendant. | |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

A.   RELEVANT PERSONS AND ENTITIES

1.   The Los Angeles Department of Water and Power ("LADWP") was the largest municipal utility in the United States, and provided water and electricity services to approximately 4 million residents in and around the City of Los Angeles (the "City"). LADWP was governed by a five-member Board of Commissioners (the "LADWP Board").

2.   The Los Angeles City Attorney's Office ("City Attorney's Office") wrote every municipal law for the City, advised the Mayor, the City Council, and all City departments and commissions, defended the City in litigation, brought forth lawsuits on behalf of the

people of the City, and prosecuted misdemeanor crimes. The City Attorney's Office was an agency of the City of Los Angeles, which received more than $10,000 per year in funds from the United States, including for the years 2015 through 2017, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

3. Relevant attorneys and personnel in private practice included the following:

　　a.　Defendant PAUL O. PARADIS was an attorney licensed in New York.

　　b.　Paradis Law Partner was an attorney licensed in New York and the law partner of defendant PARADIS.

　　c.　Paul Kiesel ("Kiesel") was an attorney licensed in California. Kiesel owned and operated a law firm (the "Kiesel Law Firm") based in California that served clients both within and outside the State.

　　d.　Ohio Attorney was an attorney licensed in Ohio.

　　e.　California Attorney was an attorney licensed in California.

4. LADWP General Manager was the General Manager of LADWP from on or about September 6, 2016, until on or about July 23, 2019.

B.　THE KICKBACK SCHEME

**1.　The LADWP Billing Debacle**

5. In 2013, LADWP implemented a new billing system, which it had procured from an outside vendor, PricewaterhouseCoopers ("PwC"). After LADWP implemented the new billing system, hundreds of thousands of LADWP customers ("ratepayers") received massively inflated and

2

otherwise inaccurate utility bills, including bills that undercharged ratepayers to the financial detriment of LADWP.

6. By in or around December 2014, the City and LADWP were facing multiple class action lawsuits (collectively, the "class action lawsuits") by ratepayers alleging various claims based on LADWP's faulty billing system.

7. The City Attorney's Office represented the City and LADWP in those class action lawsuits. The City Attorney's Office was also aided by attorneys from an outside law firm ("Class Action Counsel").

8. On or about December 16, 2014, the City Attorney's Office retained defendant PARADIS and Kiesel as Special Counsel to represent the City in a contemplated lawsuit against PwC.

9. Under the terms of the Special Counsel contract, defendant PARADIS and Kiesel would act as agents for the City and were to render their services on a contingency-fee basis, meaning that they would not be paid until and unless the City prevailed in its lawsuit against PwC, at which time they would jointly receive approximately 19.9% of damages awarded to the City. The terms of the Special Counsel contract specified that defendant PARADIS and Kiesel would bear all costs for the City's lawsuit against PwC, to be reimbursed only upon a successful result in the lawsuit.

10. The City alleged that PwC had caused hundreds of millions of dollars in damage. Defendant PARADIS's and Kiesel's 19.9% share of such a recovery would have totaled upwards of $39,000,000.

11. At the time that defendant PARADIS began representing the City as Special Counsel in or around December 2014, he also represented an LADWP ratepayer, Antwon Jones, who had a claim arising from LADWP billing overcharges. By in or around January 2015,

3

members of the City Attorney's Office were aware that defendant PARADIS was simultaneously representing both the City and Jones.

12. In or around January and February of 2015, the City Attorney's Office pursued a strategy whereby defendant PARADIS and Kiesel would represent both the City and Jones in parallel lawsuits against PwC (the "parallel litigation strategy"). The parallel litigation strategy also entailed convincing counsel for the plaintiffs in the existing class action lawsuits against the City to dismiss their claims and instead join the City in coordinated litigation against PwC.

13. By on or about February 23, 2015, members of the City Attorney's Office decided not to pursue the parallel litigation strategy.

14. On or about February 23, 2015, at least one senior member of the City Attorney's Office met with defendant PARADIS, Kiesel, and Paradis Law Partner to discuss how to proceed in the wake of the abandoned parallel litigation strategy. In lieu of the parallel litigation strategy, defendant PARADIS and Kiesel were authorized and directed to find counsel that would be friendly to the City to supposedly represent Jones in a class action case against the City. This was at times referred to as the "white knight" strategy, because Jones would be (unwittingly) used to save the City from the existing lawsuits. Pursuant to the white knight strategy, which was known to multiple members of the City Attorney's Office by late March of 2015, the forthcoming *Jones v. City* class action would be used as a vehicle to settle all existing LADWP-billing-related claims against the City on the City's desired terms.

15. Soon thereafter, pursuant to the agreed-upon white knight strategy, defendant PARADIS recruited Ohio Attorney to supposedly represent Jones in a lawsuit against the City. Defendant PARADIS told Ohio Attorney that the City wanted the lawsuit to be "pre-settled" on the City's desired terms. Defendant PARADIS and Ohio Attorney agreed that in exchange for doing all or most of Ohio Attorney's substantive work on the case, defendant PARADIS would receive twenty percent of Ohio Attorney's fees in the case as a secret kickback.

16. Because of state court rules requiring that a party to a lawsuit in the State of California have at least one lawyer who is admitted to the California bar, in or around early March of 2015, Kiesel recruited California Attorney to function as local counsel supposedly representing Jones.

### 2. The City's Affirmative Lawsuit Against PwC

17. On March 6, 2015, the City filed a civil lawsuit against PwC ("*City v. PwC*"), which generally alleged that PwC was responsible for LADWP's billing debacle. Defendant PARADIS and Kiesel represented the City in that action for approximately four years, until on or about March 6, 2019.

18. Because defendant PARADIS and Kiesel were operating as Special Counsel for the City, the City Attorney's Office had a legal and ethical responsibility to supervise the Special Counsel and to maintain ultimate control over the litigation of *City v. PwC*. Accordingly, the Special Counsel contract provided that the City Attorney's Office would "retain final authority over all material aspects" of dispute resolution and litigation.

5

**3. The Collusive Class Action Lawsuit**

19. In or around March of 2015, defendant PARADIS, while serving as Special Counsel and pursuant to the agreed-upon white knight strategy, used nonpublic information provided to him by members of the City Attorney's Office and LADWP to draft a detailed complaint for a class action lawsuit against the City with Jones as the named class representative ("*Jones v. City*").

20. On or about March 26, 2015, defendant PARADIS provided the draft *Jones v. City* complaint to Ohio Attorney for filing.

21. On April 1, 2015, as expected by multiple members of the City Attorney's Office, Ohio Attorney filed the *Jones v. City* complaint that defendant PARADIS had drafted.

22. On or about April 8, 2015, members of the City Attorney's Office met with Ohio Attorney to discuss settlement terms that would enable *Jones v. City* to be used as the vehicle to globally settle all of the LADWP billing claims against the City.

23. Between on or about June 11, 2015, and on or about July 31, 2015, defendant PARADIS and others on behalf of the City participated in four confidential mediation sessions with Ohio Attorney. The other class action plaintiffs were excluded from these sessions. At the close of the final session, the mediator issued a proposal that would cap plaintiff attorneys' fees at $13,000,000.

24. On August 1, 2015, the City's Class Action Counsel sent an email to members of the City Attorney's Office detailing Class Action Counsel's many reasons for believing that the $13,000,000 attorney fee proposal was unjustifiably high. The enumerated reasons included that Ohio Attorney had done "little demonstrative work to advance the interests of the class."

6

25. On or about August 1, 2015, a senior member of the City Attorney's Office endorsed Class Action Counsel's objections to the excessive attorneys' fees, stating that Class Action Counsel had "superbly summarize[d] the many issues" with the attorneys' fee proposal.

26. Notwithstanding the numerous concerns that were raised by the City's Class Action Counsel and disputed by no one, on or about August 20, 2015 — less than three weeks later — the City and Ohio Attorney filed a stipulated agreement that would provisionally resolve all claims against the City related to the LADWP billing debacle and accept the $13,000,000 cap on plaintiff attorneys' fees.

27. On or about October 31, 2016, defendant PARADIS and others on behalf of the City attended another mediation session with Ohio Attorney. The parties agreed to revise the August 20, 2015 stipulated agreement, including by raising the cap on plaintiff attorneys' fees to approximately $19,000,000.

28. On or about July 20, 2017, the Los Angeles County Superior Court judge overseeing the class actions issued a final approval of an approximately $67,000,000 settlement agreement in *Jones v. City*, including approximately $19,000,000 in plaintiff attorneys' fees.

29. On or about July 28, 2017, pursuant to the settlement agreement, the City sent a check to Ohio Attorney in the amount of approximately $19,241,003. After disbursing some of those funds to California Attorney and some to attorneys for other class plaintiffs in accordance with the terms of the settlement agreement, Ohio Attorney and his law firm retained approximately $10,300,000 in attorney fees.

30. Pursuant to his prior agreement to pay defendant PARADIS twenty percent of his *Jones v. City* earnings, Ohio Attorney secretly paid $2,175,000 to defendant PARADIS. This kickback, which was disguised as a real estate investment, was funneled through shell companies that defendant PARADIS and Ohio Attorney had set up exclusively for the purpose of transmitting and concealing the kickback.

C. THE AVENTADOR CONTRACT BRIBERY SCHEME

    **1. Defendant PARADIS Contracts With LADWP For Technical Services Related to the Billing Litigation**

31. On or about October 19, 2015, the LADWP Board awarded a one-year, approximately $1,304,090 no-bid contract to defendant PARADIS's law firm, the Paradis Law Group, PLLC ("PLG"), to provide project management services in connection with LADWP's billing system remediation.

32. On or about May 23, 2016, the LADWP Board extended PLG's project management services contract for another year and increased the value of the contract by approximately $4,725,675.

    **2. Defendant PARADIS Begins Ghostwriting the Court-Appointed Independent Monitor's Reports to the Court**

33. In or around December 2015, the Los Angeles Superior Court judge overseeing the *Jones v. City* lawsuit appointed an independent monitor ("Independent Monitor") to oversee and report to the court on LADWP's performance under the *Jones v. City* settlement agreement, which required LADWP to remediate its billing system and meet various benchmarks over a specific period of time, among other obligations.

34. During the course of Independent Monitor's work as the entity appointed by the court to deliver objective and unbiased reports, defendant PARADIS and Independent Monitor formed a personal

relationship. Over the course of that relationship and during the Independent Monitorship, defendant PARADIS treated Independent Monitor to sporting events, as well as meals and drinks, on multiple occasions.

35. As part of Independent Monitor's duties, the court required him to file periodic reports with the court describing, among other things, LADWP's progress in meeting its remediation obligations and the benchmarks contained in the *Jones v. City* settlement agreement. With the knowledge and approval of multiple LADWP officials and employees and others, defendant PARADIS drafted the substance of nearly all of Independent Monitor's reports to the court. Independent Monitor never disclosed to the court that he relied on defendant PARADIS for nearly all of his reports. Ghostwriting Independent Monitor's reports allowed defendant PARADIS to position himself for a lucrative contract in connection with the remediation work.

**3. Defendant PARADIS Forms a Personal Relationship with LADWP General Manager, and They Begin Planning for a Future LADWP Contract**

36. Through his involvement in the *City v. PwC* case and providing project management services for LADWP's billing system, defendant PARADIS formed a close working and personal relationship with LADWP General Manager. Defendant PARADIS and LADWP General Manager traveled together for both work and personal purposes, attended concerts and other events together, and dined together at expensive restaurants. Defendant PARADIS regularly paid for LADWP General Manager at these outings.

37. During PLG's project management services contract, defendant PARADIS and LADWP General Manager discussed ways for

9

defendant PARADIS to perform additional work for LADWP.  In or around early 2017, defendant PARADIS advised LADWP General Manager that, as a law firm, PLG could not provide future remediation services for LADWP based on state bar rules prohibiting defendant PLG from providing non-legal services.  They discussed having defendant PARADIS form a new company to provide future remediation and other services to LADWP, under a new contract with LADWP.

        *(a)   Defendant PARADIS Agrees To Give LADWP General Manager a Future Job, Million-Dollar Salary, and Company Car in Exchange for LADWP General Manager's Help Securing Lucrative Contract*

      38.  On or about February 10, 2017, defendant PARADIS met privately with LADWP General Manager at a hotel in Riverside, California.  During this meeting, defendant PARADIS and LADWP General Manager discussed the fact that defendant PARADIS was forming a new company, Aventador Utility Solutions, LLC ("Aventador") to secure a lucrative no-bid contract with LADWP that would include, among other work, continued remediation services as well as cyber-related services.  Defendant PARADIS and LADWP General Manager discussed ways that LADWP General Manager could benefit financially from Aventador.  Specifically, defendant PARADIS and LADWP General Manager agreed that LADWP General Manager would work to ensure that the LADWP Board awarded a contract to Aventador.  In exchange, they agreed that LADWP General Manager would receive, among other benefits: (1) to be the Chief Executive Officer ("CEO") of Aventador upon LADWP General Manager's retirement from LADWP; (2) an approximately $1,000,000 annual salary upon joining Aventador; and (3) a new Mercedes SL 550 as LADWP General Manager's company car.

39. On or about March 28, 2017, defendant PARADIS registered Aventador with the California Secretary of State.

   *(b) Defendant PARADIS Writes a Self-Serving Independent Monitor Report Padded with Crucial Support for the Aventador Contract*

40. In or around early May of 2017, defendant PARADIS drafted the next periodic court report for Independent Monitor, which LADWP General Manager reviewed before defendant PARADIS provided it to Independent Monitor. As discussed and agreed with LADWP General Manager, defendant PARADIS's primary goal in drafting this report was to provide LADWP General Manager with support for his campaign to persuade the LADWP Board to award the $30,000,000 no-bid contract to Aventador.

41. On or about May 5, 2017, Independent Monitor's report was filed with the court in the *Jones v. City* case. Section IV of the report, which defendant PARADIS drafted specifically to include talking points for LADWP General Manager to use to convince the LADWP Board to approve the Aventador contract, stated, among other things, that LADWP was grossly understaffed in the Information Technology ("IT") area and needed to procure these services through an outside vendor.

   *(c) LADWP General Manager and Defendant PARADIS Work to Secure the LADWP Board's Support for a $30,000,000 No-Bid Contract to Aventador*

42. In or around May 2017 and early June 2017, defendant PARADIS and LADWP General Manager worked together to position Aventador to secure a $30,000,000 no-bid contract with LADWP. These efforts included lobbying individual LADWP Board members and other LADWP employees and officials to solicit their support for the Aventador contract, editing drafts of a letter that was ultimately

sent to the LADWP Board summarizing the purpose and terms of the proposed Aventador contract and explaining why alternatives to awarding the contract on a no-bid basis were unsatisfactory (the "Board Letter"), and omitting defendant PARADIS's affiliation with Aventador from LADWP General Manager's oral and written presentation urging the LADWP Board to vote in favor of the Aventador contract.

**4. Relying on LADWP General Manager's Presentation and the Independent Monitor Report Ghostwritten By Defendant PARADIS, the LADWP Board Votes to Award a $30,000,000 No-Bid Contract to Aventador**

43. On June 6, 2017, the LADWP Board met and considered the Aventador contract.

44. In a presentation to the LADWP Board immediately before the vote, LADWP General Manager cited the verbiage of the May 5, 2017 Independent Monitor report secretly written by defendant PARADIS, told the LADWP Board that LADWP could not meet its obligations under the *Jones v. City* settlement agreement unless it contracted with Aventador, and conveyed a sense of urgency to approve the Aventador contract quickly. LADWP General Manager never disclosed to the LADWP Board that he had agreed to accept from defendant PARADIS the title of Aventador's CEO, an annual salary of approximately $1,000,000, and a luxury company Mercedes in exchange for his support of the Aventador contract.

45. Following LADWP General Manager's presentation, the LADWP Board voted unanimously to award Aventador a three-year, $30,000,000 no-bid contract.

### 5. To Obtain Support For the Aventador Contract, Defendant PARADIS Provides, With LADWP General Manager's Encouragement, Unpaid Legal Services to LADWP Board Member

46. Beginning approximately a week before the LADWP Board's vote on the Aventador contract, a member of the LADWP Board ("LADWP Board Member") solicited legal services from defendant PARADIS on an unrelated litigation matter.  Defendant PARADIS understood that if he agreed to provide the requested legal services, LADWP Board Member would vote in favor of the contract.  Defendant PARADIS discussed LADWP Board Member's repeated requests with LADWP General Manager, who replied by advising defendant PARADIS that LADWP Board Member had been reappointed for four more years, which defendant PARADIS understood to mean that he should provide the requested legal services solicited by LADWP Board Member in order to obtain LADWP Board Member's support on the Aventador contract.  Accordingly, defendant PARADIS performed, and directed Paradis Law Partner to perform, the requested legal work, which included conducting legal research; reviewing and revising legal briefing and filings; and participating in meetings, calls, and discussions with LADWP Board Member and his/her litigation team concerning legal strategy and tactics.  Defendant PARADIS did so in order to influence LADWP Board Member's vote for the Aventador contract and in order to continue to influence LADWP Board Member for purposes of future Board votes.  In total, between in or around late May 2017 and in or around early August 2017, defendant PARADIS and Paradis Law Partner performed approximately thirty hours of legal services for LADWP Board Member. Defendant PARADIS did not seek payment for these services from LADWP Board Member, nor did LADWP Board Member offer payment.

### 6. Defendant PARADIS and LADWP General Manager Continue to Secretly Work Together to Build Aventador for Their Mutual Personal Benefit

47. During the remainder of 2017, throughout 2018, and into early 2019, defendant PARADIS and LADWP General Manager continued to collaborate to build and market Aventador and to seek additional lucrative business opportunities for Aventador both inside and outside LADWP.

48. On multiple occasions in late 2018 and early 2019, via text message, LADWP General Manager conveyed to defendant PARADIS that he was ready to leave LADWP, and they discussed how LADWP General Manager would use his remaining tenure at LADWP to obtain an extension of Aventador's contract and otherwise enhance Aventador's future financial prospects.

### 7. Defendant PARADIS and LADWP General Manager Expand Their Corrupt Aventador Plans

49. In May of 2018, LADWP General Manager and other LADWP officials and employees, along with defendant PARADIS, joined a delegation on a visit to Israel.  During the trip, defendant PARADIS and LADWP General Manager met with officials from a global company that provided cybersecurity training to governmental and business organizations ("Cyber Company").  Cyber Company had franchises in the United States and abroad, and defendant PARADIS and LADWP General Manager decided to invest in bringing a Cyber Company facility to Los Angeles.  Defendant PARADIS and LADWP General Manager agreed that defendant PARADIS would put up $5,000,000 in capital and would have a controlling interest, and that LADWP General Manager would have an ownership interest.  LADWP General Manager told defendant PARADIS that LADWP would purchase five years of cybersecurity training at the

franchise facility, at a cost of $3,000,000 per year. LADWP General Manager did not have the formal authority to make this commitment on behalf of LADWP without action by the LADWP Board. Defendant PARADIS and LADWP General Manager agreed that LADWP General Manager would use his position and influence at LADWP to convince the LADWP Board to support and vote in favor of this expenditure, which both defendant PARADIS and LADWP General Manager knew and intended would secretly benefit them both financially.

50. In January 2019, pursuant to his agreement with LADWP General Manager, defendant PARADIS entered into a joint venture agreement with Cyber Company wherein defendant PARADIS agreed to pay $5,000,000 to open a Cyber Company facility in Los Angeles that would provide training to LADWP employees.

51. These Introductory Allegations are incorporated into the sole count of this Information.

COUNT ONE

[18 U.S.C. § 666(a)(1)(B)]

52. Between on or about February 25, 2015, and on or about November 10, 2017, defendant PAUL O. PARADIS, an agent of the City Attorney's Office and the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City Attorney's Office having a value of $5,000 or more. Specifically, defendant PARADIS solicited, demanded, accepted, and agreed to accept a kickback of approximately $2,175,000, intending to be influenced and rewarded in return for defendant PARADIS's arrangement for Ohio Attorney to putatively represent Antwon Jones and a class of LADWP ratepayers in a lawsuit against the City, which would be resolved in a rapid settlement that would net Ohio Attorney and his law firm approximately $10,300,000 in attorneys' fees despite Ohio Attorney and his law firm doing little legal work.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

53. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count One of this Information.

54. The defendant, if so convicted, shall forfeit to the United States of America the following:

    (a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to such offense; and

    (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

55. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred,

//
//
//
//
//

sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption
and Civil Rights Section

MELISSA MILLS
J. JAMARI BUXTON
SUSAN S. HAR
Assistant United States Attorneys