1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   MELISSA MILLS (Cal. Bar No. 248529)
4  J. JAMARI BUXTON (Cal. Bar No. pending)
   SUSAN S. HAR (Cal. Bar No. 301924)
5  Assistant United States Attorneys
   Public Corruption and Civil Rights Section
6       1500 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone:  (213) 894-0627
8       Facsimile:  (213) 894-7631
        E-mail:     Melissa.Mills@usdoj.gov
9                   Jamari.Buxton@usdoj.gov
                    Susan.Har@usdoj.gov
10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

**FILED**
CLERK, U.S. DISTRICT COURT

**11/29/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

12              UNITED STATES DISTRICT COURT

13           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,        No. CR   2:21-cr-00540-SB

15           Plaintiff,             PLEA AGREEMENT FOR DEFENDANT
                                    PAUL O. PARADIS
16              v.

17 PAUL O. PARADIS,

18           Defendant.

19

20       1.    This constitutes the plea agreement between defendant PAUL

21 O. PARADIS ("defendant") and the United States Attorney's Office for

22 the Central District of California ("the USAO") in the above-

23 captioned case.  This agreement is limited to the USAO and cannot

24 bind any other federal, state, local, or foreign prosecuting,

25 enforcement, administrative, regulatory, or licensing authorities.

26                     DEFENDANT'S OBLIGATIONS

27       2.    Defendant agrees to:

28

a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender if ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Give up the right to indictment by a grand jury.

3.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, regulatory, or licensing authority, including the Bar of any state.  This cooperation requires defendant to:

2

1        a.    Respond truthfully and completely to all questions
2 that may be put to defendant, whether in interviews, before a grand
3 jury, or at any trial or other court proceeding.

4        b.    Attend all meetings, grand jury sessions, trials or
5 other proceedings at which defendant's presence is requested by the
6 USAO or compelled by subpoena or court order.

7        c.    Produce voluntarily all documents, records, or other
8 tangible evidence relating to matters about which the USAO, or its
9 designee, inquires.

10    4.    For purposes of this agreement: (1) "Cooperation
11 Information" shall mean any statements made, or documents, records,
12 tangible evidence, or other information provided, by defendant
13 pursuant to defendant's cooperation under this agreement; and
14 (2) "Plea Information" shall mean any statements made by defendant,
15 under oath, at the guilty plea hearing and the agreed-to factual
16 basis statement in this agreement.

17                        THE USAO'S OBLIGATIONS

18    5.    The USAO agrees to:

19        a.    Not contest facts agreed to in this agreement.

20        b.    Abide by all agreements regarding sentencing contained
21 in this agreement.

22        c.    Except for criminal tax violations (including
23 conspiracy to commit such violations chargeable under 18 U.S.C.
24 § 371), not further criminally prosecute defendant for conduct
25 described in the agreed-to factual basis set forth in Attachment A.
26 Defendant understands that the USAO is free to criminally prosecute
27 defendant for any other unlawful past conduct or any unlawful conduct
28 that occurs after the date of this agreement.  Defendant agrees that

                                   3

1    at the time of sentencing the Court may consider the uncharged
2    conduct in determining the applicable Sentencing Guidelines range,
3    the propriety and extent of any departure from that range, and the
4    sentence to be imposed after consideration of the Sentencing
5    Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

6        d.    At the time of sentencing, provided that defendant
7    demonstrates an acceptance of responsibility for the offense conduct,
8    including the relevant conduct described in the agreed-upon factual
9    basis, up to and including the time of sentencing, recommend a two-
10   level reduction in the applicable Sentencing Guidelines offense
11   level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if
12   appropriate, move for an additional one-level reduction if available
13   under that section.

14       6.    The USAO further agrees:

15       a.    Not to offer as evidence in its case-in-chief in the
16   above-captioned case or any other criminal prosecution that may be
17   brought against defendant by the USAO, any Cooperation Information.
18   Defendant agrees, however, that the USAO may use both Cooperation
19   Information and Plea Information: (1) to obtain and pursue leads to
20   other evidence, which evidence may be used for any purpose, including
21   any criminal prosecution of defendant; (2) to cross-examine defendant
22   should defendant testify, or to rebut any evidence offered, or
23   argument or representation made, by defendant, defendant's counsel,
24   or a witness called by defendant in any trial, sentencing hearing, or
25   other court proceeding; (3) in any criminal prosecution of defendant
26   for false statement, obstruction of justice, or perjury; and (4) at
27   defendant's sentencing.  Defendant understands that Cooperation
28

1  Information will be disclosed to the United States Probation and
2  Pretrial Services Office and the Court.

3          b.   In connection with defendant's sentencing, to bring to
4  the Court's attention the nature and extent of defendant's
5  cooperation.

6          c.   If the USAO determines, in its exclusive judgment,
7  that defendant has both complied with defendant's obligations under
8  paragraphs 2 and 3 above and provided substantial assistance to law
9  enforcement in the prosecution or investigation of another
10 ("substantial assistance"), to move the Court pursuant to U.S.S.G.
11 § 5K1.1 to fix an offense level and corresponding guideline range
12 below that otherwise dictated by the sentencing guidelines, and to
13 recommend a sentence at the low end of or below this reduced range.

14               DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

15     7.   Defendant understands the following:

16          a.   Any knowingly false or misleading statement by
17 defendant will subject defendant to prosecution for false statement,
18 obstruction of justice, and perjury and will constitute a breach by
19 defendant of this agreement.

20          b.   Nothing in this agreement requires the USAO or any
21 other prosecuting, enforcement, administrative, regulatory, or
22 licensing authority to accept any cooperation or assistance that
23 defendant may offer, or to use it in any particular way.

24          c.   Defendant cannot withdraw defendant's guilty plea if
25 the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a
26 reduced guideline range or if the USAO makes such a motion and the
27 Court does not grant it or if the Court grants such a USAO motion but
28 elects to sentence above the reduced range.

1          d.    At this time the USAO makes no agreement or

2    representation as to whether any cooperation that defendant has

3    provided or intends to provide constitutes or will constitute

4    substantial assistance.  The decision whether defendant has provided

5    substantial assistance will rest solely within the exclusive judgment

6    of the USAO.

7          e.    The USAO's determination whether defendant has

8    provided substantial assistance will not depend in any way on whether

9    the government prevails at any trial or court hearing in which

10   defendant testifies or in which the government otherwise presents

11   information resulting from defendant's cooperation.

12                        NATURE OF THE OFFENSE

13        8.    Defendant understands that for defendant to be guilty of

14   the crime charged in count one of the information, that is, bribery

15   concerning programs receiving federal funds, in violation of Title

16   18, United States Code, Section 666(a)(1)(B), the following must be

17   true:

18        a.    The defendant was an agent of the Los Angeles City

19   Attorney's Office and the City of Los Angeles;

20        b.    The defendant corruptly solicited or demanded for the

21   benefit of any person, or accepted or agreed to accept anything of

22   value from any person;

23        c.    The defendant intended to be influenced or rewarded in

24   connection with any business, transaction, or series of transactions

25   of the Los Angeles City Attorney's Office and the City of Los Angeles

26   involving anything of value of $5,000 or more; and

27        d.    The Los Angeles City Attorney's Office was an agency

28   of the City of Los Angeles, which received, during the years 2015-

                                6

2017, annual benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or any other form of Federal assistance.

### PENALTIES

9.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 666(a)(1)(B), is: 10 years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or

1  supervised release in another case and suspension or revocation of a
2  professional license.  Defendant understands that unanticipated
3  collateral consequences will not serve as grounds to withdraw
4  defendant's guilty plea.

5      12.  Defendant understands that, if defendant is not a United
6  States citizen, the felony conviction in this case may subject
7  defendant to: removal, also known as deportation, which may, under
8  some circumstances, be mandatory; denial of citizenship; and denial
9  of admission to the United States in the future.  The Court cannot,
10 and defendant's attorney also may not be able to, advise defendant
11 fully regarding the immigration consequences of the felony conviction
12 in this case.  Defendant understands that unexpected immigration
13 consequences will not serve as grounds to withdraw defendant's guilty
14 plea.

15                         FACTUAL BASIS

16     13.  Defendant admits that defendant is, in fact, guilty of the
17 offense to which defendant is agreeing to plead guilty.  Defendant
18 and the USAO agree to the statement of facts provided in Attachment A
19 hereto and agree that this statement of facts is sufficient to
20 support a plea of guilty to the charge described in this agreement
21 and to establish the Sentencing Guidelines factors set forth in
22 paragraph 15 below but is not meant to be a complete recitation of
23 all facts relevant to the underlying criminal conduct or all facts
24 known to either party that relate to that conduct.

25                       SENTENCING FACTORS

26     14.  Defendant understands that in determining defendant's
27 sentence the Court is required to calculate the applicable Sentencing
28 Guidelines range and to consider that range, possible departures

                              8

1  under the Sentencing Guidelines, and the other sentencing factors set
2  forth in 18 U.S.C. § 3553(a).  Defendant understands that the
3  Sentencing Guidelines are advisory only, that defendant cannot have
4  any expectation of receiving a sentence within the calculated
5  Sentencing Guidelines range, and that after considering the
6  Sentencing Guidelines and the other § 3553(a) factors, the Court will
7  be free to exercise its discretion to impose any sentence it finds
8  appropriate up to the maximum set by statute for the crime of
9  conviction.

10      15.  Defendant and the USAO agree to the following applicable
11  Sentencing Guidelines factors:

12  Base Offense Level:              14    [U.S.S.G. § 2C1.1(a)(1)]

13  Value of bribe between
    $1,500,001-$3,500,000            +16   [U.S.S.G. § 2B1.1(b)(1)(I)]
14

15  Involved more than one bribe     +2    [U.S.S.G. § 2C1.1(b)(1)]

16  Involved high-level/sensitive    +4    [U.S.S.G. § 2C1.1(b)(3)]
    position
17

18  Defendant and the USAO reserve the right to argue that additional
19  specific offense characteristics, adjustments, and departures under
20  the Sentencing Guidelines are appropriate.  In particular, defendant
21  may argue for downward departures under U.S.S.G. § 5H1.4 (physical
22  condition) and U.S.S.G. § 5K2.16 (voluntary disclosure).

23      16.  Defendant understands that there is no agreement as to
24  defendant's criminal history or criminal history category.

25      17.  Defendant and the USAO reserve the right to argue for a
26  sentence outside the sentencing range established by the Sentencing
27  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
28  (a)(2), (a)(3), (a)(6), and (a)(7).

1          WAIVER OF CONSTITUTIONAL RIGHTS

2      18.  Defendant understands that by pleading guilty, defendant

3  gives up the following rights:

4          a.    The right to persist in a plea of not guilty.

5          b.    The right to a speedy and public trial by jury.

6          c.    The right to be represented by counsel -- and if

7  necessary have the Court appoint counsel -- at trial.  Defendant

8  understands, however, that, defendant retains the right to be

9  represented by counsel -- and if necessary have the Court appoint

10 counsel -- at every other stage of the proceeding.

11         d.    The right to be presumed innocent and to have the

12 burden of proof placed on the government to prove defendant guilty

13 beyond a reasonable doubt.

14         e.    The right to confront and cross-examine witnesses

15 against defendant.

16         f.    The right to testify and to present evidence in

17 opposition to the charges, including the right to compel the

18 attendance of witnesses to testify.

19         g.    The right not to be compelled to testify, and, if

20 defendant chose not to testify or present evidence, to have that

21 choice not be used against defendant.

22         h.    Any and all rights to pursue any affirmative defenses,

23 Fourth Amendment or Fifth Amendment claims, and other pretrial

24 motions that have been filed or could be filed.

25          WAIVER OF APPEAL OF CONVICTION

26     19.  Defendant understands that, with the exception of an appeal

27 based on a claim that defendant's guilty plea was involuntary, by

28 pleading guilty defendant is waiving and giving up any right to

10

appeal defendant's conviction on the offense to which defendant is
pleading guilty.  Defendant understands that this waiver includes,
but is not limited to, arguments that the statute to which defendant
is pleading guilty is unconstitutional, and any and all claims that
the statement of facts provided herein is insufficient to support
defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

20.  Defendant agrees that, provided the Court imposes a total
term of imprisonment on the count of conviction of no more than the
statutory maximum of ten years, defendant gives up the right to
appeal all of the following: (a) the procedures and calculations used
to determine and impose any portion of the sentence; (b) the term of
imprisonment imposed by the Court; (c) the fine imposed by the Court,
provided it is within the statutory maximum; (d) to the extent
permitted by law, the constitutionality or legality of defendant's
sentence, provided it is within the statutory maximum; (e) the term
of probation or supervised release imposed by the Court, provided it
is within the statutory maximum; and (f) any of the following
conditions of probation or supervised release imposed by the Court:
the conditions set forth in Second Amended General Order 20-04 of
this Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

21.  The USAO agrees that, provided all portions of the sentence
are at or below the statutory maximum specified above, the USAO gives
up its right to appeal any portion of the sentence.

22.  Defendant also gives up any right to bring a post-
conviction collateral attack on the conviction or sentence, except a

11

post-conviction collateral attack based on a claim of ineffective
assistance of counsel, a claim of newly discovered evidence, or an
explicitly retroactive change in the applicable Sentencing
Guidelines, sentencing statutes, or statutes of conviction.
Defendant understands that this waiver includes, but is not limited
to, arguments that the statute to which defendant is pleading guilty
is unconstitutional, and any and all claims that the statement of
facts provided herein is insufficient to support defendant's plea of
guilty.

RESULT OF WITHDRAWAL OF GUILTY PLEA

23.  Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement, including in particular its
obligations regarding the use of Cooperation Information; (b) in any
investigation, criminal prosecution, or civil, administrative, or
regulatory action, defendant agrees that any Cooperation Information
and any evidence derived from any Cooperation Information shall be
admissible against defendant, and defendant will not assert, and
hereby waives and gives up, any claim under the United States
Constitution, any statute, or any federal rule, that any Cooperation
Information or any evidence derived from any Cooperation Information
should be suppressed or is inadmissible, and (c) should the USAO
choose to pursue any charge that was either dismissed or not filed as
a result of this agreement, then (i) any applicable statute of
limitations will be tolled between the date of defendant's signing of

this agreement and the filing commencing any such action; and

(ii) defendant waives and gives up all defenses based on the statute

of limitations, any claim of pre-indictment delay, or any speedy

trial claim with respect to any such action, except to the extent

that such defenses existed as of the date of defendant's signing this

agreement.

### RESULT OF VACATUR, REVERSAL OR SET-ASIDE

24.   Defendant agrees that if the count of conviction is

vacated, reversed, or set aside, both the USAO and defendant will be

released from all their obligations under this agreement.

### EFFECTIVE DATE OF AGREEMENT

25.   This agreement is effective upon signature and execution of

all required certifications by defendant, defendant's counsel, and an

Assistant United States Attorney.

### BREACH OF AGREEMENT

26.   Defendant agrees that if defendant, at any time after the

signature of this agreement and execution of all required

certifications by defendant, defendant's counsel, and an Assistant

United States Attorney, knowingly violates or fails to perform any of

defendant's obligations under this agreement ("a breach"), the USAO

may declare this agreement breached.   For example, if defendant

knowingly, in an interview, before a grand jury, or at trial, falsely

accuses another person of criminal conduct or falsely minimizes

defendant's own role, or the role of another, in criminal conduct,

defendant will have breached this agreement.   All of defendant's

obligations are material, a single breach of this agreement is

sufficient for the USAO to declare a breach, and defendant shall not

be deemed to have cured a breach without the express agreement of the

1 USAO in writing.  If the USAO declares this agreement breached, and
2 the Court finds such a breach to have occurred, then:

3          a.    If defendant has previously entered a guilty plea
4 pursuant to this agreement, defendant will not be able to withdraw
5 the guilty plea.

6          b.    The USAO will be relieved of all its obligations under
7 this agreement; in particular, the USAO: (i) will no longer be bound
8 by any agreements concerning sentencing and will be free to seek any
9 sentence up to the statutory maximum for the crime to which defendant
10 has pleaded guilty; (ii) will no longer be bound by any agreements
11 regarding criminal prosecution, and will be free to criminally
12 prosecute defendant for any crime, including charges that the USAO
13 would otherwise have been obligated not to criminally prosecute]
14 pursuant to this agreement; and (iii) will no longer be bound by any
15 agreement regarding the use of Cooperation Information and will be
16 free to use any Cooperation Information in any way in any
17 investigation, criminal prosecution, or civil, administrative,
18 regulatory, or licensing action.

19          c.    The USAO will be free to criminally prosecute
20 defendant for false statement, obstruction of justice, and perjury
21 based on any knowingly false or misleading statement by defendant.

22          d.    In any investigation, criminal prosecution, or civil,
23 administrative, or regulatory action: (i) defendant will not assert,
24 and hereby waives and gives up, any claim that any Cooperation
25 Information was obtained in violation of the Fifth Amendment
26 privilege against compelled self-incrimination; and (ii) defendant
27 agrees that any Cooperation Information and any Plea Information, as
28 well as any evidence derived from any Cooperation Information or any

Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

27.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

28.  Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

15

29.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 15 are consistent with the facts of this case.  This paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the Factual Basis or Sentencing Factors agreed to in this agreement.

30.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

31.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO

16

1  and defendant or defendant's attorney, and that no additional

2  promise, understanding, or agreement may be entered into unless in a

3  writing signed by all parties or on the record in court.

4              PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

5        32.  The parties agree that this agreement will be considered

6  part of the record of defendant's guilty plea hearing as if the

7  entire agreement had been read into the record of the proceeding.

8  AGREED AND ACCEPTED

9  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
10 CALIFORNIA

11 TRACY L. WILKISON
   United States Attorney

12

13 _____          11/24/2021
   MELISSA MILLS                            _____
14 Assistant United States Attorney         Date

15 _____          11/19/2021
   PAUL O. PARADIS                          _____
16 Defendant                                Date

17 _____          11/19/2021
18 DAVID SCHEPER                            _____
   Attorney for Defendant PAUL O.          Date
19 PARADIS

20

21

22

23

24

25

26

27

28

                              17

1

CERTIFICATION OF DEFENDANT

2       I have read this agreement in its entirety.  I have had enough

3  time to review and consider this agreement, and I have carefully and

4  thoroughly discussed every part of it with my attorney.  I understand

5  the terms of this agreement, and I voluntarily agree to those terms.

6  I have discussed the evidence with my attorney, and my attorney has

7  advised me of my rights, of possible pretrial motions that might be

8  filed, of possible defenses that might be asserted either prior to or

9  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19  _____          ___11 / 19 / 2021___

20  PAUL O. PARADIS                      Date
    Defendant

21

22

23

24

25

26

27

28

18

1     CERTIFICATION OF DEFENDANT'S ATTORNEY

2        I am PAUL O. PARADIS's attorney.  I have carefully and

3    thoroughly discussed every part of this agreement with my client.

4    Further, I have fully advised my client of his rights, of possible

5    pretrial motions that might be filed, of possible defenses that might

6    be asserted either prior to or at trial, of the sentencing factors

7    set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8    provisions, and of the consequences of entering into this agreement.

9    To my knowledge: no promises, inducements, or representations of any

10   kind have been made to my client other than those contained in this

11   agreement; no one has threatened or forced my client in any way to

12   enter into this agreement; my client's decision to enter into this

13   agreement is an informed and voluntary one; and the factual basis set

14   forth in this agreement is sufficient to support my client's entry of

15   a guilty plea pursuant to this agreement.

16   _____        11/19/2021

17   DAVID SCHEPER                           Date
     Attorney for Defendant PAUL O.
18   PARADIS

19

20

21

22

23

24

25

26

27

28

                              19

1          **ATTACHMENT A**

2          FACTUAL BASIS

3    I.   **THE COLLUSIVE LITIGATION AND KICKBACK SCHEME**

4         **A.   BACKGROUND ON COLLUSIVE LITIGATION**

5              1.   At all relevant times, defendant PAUL O. PARADIS was an

6    attorney licensed in New York and the sole owner and operator of

7    Paradis Law Group, PLLC.  In fall of 2014, through a website service

8    to which he subscribed, defendant PARADIS received inquiries from Los

9    Angeles Department of Water and Power ("LADWP") ratepayers interested

10   in commencing litigation related to LADWP's billing system, which had

11   erroneously billed hundreds of thousands of LADWP ratepayers and

12   spawned multiple class action lawsuits against LADWP and the City of

13   Los Angeles (the "City").  In early December 2014, defendant PARADIS

14   was retained by ratepayer Antwon Jones.

15             2.   On December 16, 2014, defendant PARADIS and Paul Kiesel, a

16   California attorney with whom defendant PARADIS was acquainted, met

17   with two top Los Angeles City Attorney's Office ("City Attorney's

18   Office") officials to request the City's help with a potential

19   lawsuit on behalf of Mr. Jones against PricewaterhouseCoopers

20   ("PwC"), the vendor of LADWP's billing system.  At this meeting,

21   defendant PARADIS and Kiesel were asked to represent the City in an

22   affirmative lawsuit against PwC, and they agreed.  During this

23   meeting, PARADIS informed the City Attorney's Office officials that

24   defendant PARADIS also then represented Mr. Jones, the LADWP

25   ratepayer, for purposes of litigation related to the LADWP billing

26   system.

27             3.   In January and February 2015, the City Attorney's Office,

28   along with defendant PARADIS and Kiesel, pursued a strategy whereby

1  defendant PARADIS and Kiesel would represent both the City and Mr.
2  Jones in parallel lawsuits against PwC (the "parallel litigation
3  strategy").  The parallel litigation strategy entailed convincing
4  counsel for the plaintiffs in the existing class action billing
5  lawsuits already facing the City to dismiss their claims and join the
6  City in coordinated litigation against PwC.  In furtherance of the
7  parallel litigation strategy, in January of 2015, defendant PARADIS
8  drafted a complaint, styled *Antwon Jones v. PwC*, and circulated it
9  among members of the City Attorney's Office for their review and
10 feedback.

11      4.   In late February 2015, defendant PARADIS was informed by
12 members of the City Attorney's Office that the City would no longer
13 proceed with the parallel litigation strategy.

14      5.   In a meeting on or about February 23, 2015, defendant
15 PARADIS, Kiesel, and defendant PARADIS's law partner ("Paradis Law
16 Partner") met with at least one member of the City Attorney's Office
17 to discuss how the City intended to proceed in lieu of the abandoned
18 parallel litigation strategy.  At the meeting, defendant PARADIS and
19 Kiesel were directed and authorized to find outside counsel that
20 would be friendly to the City and its litigation goals to supposedly
21 represent Mr. Jones in a class action lawsuit against the City.  This
22 strategy came to be known as the "white knight" strategy, reflecting
23 the understanding that this plaintiff would not be adverse to the
24 City but would allow the City to save itself from the existing
25 claims.  It was the stated intent of all participants in this meeting
26 to use this class action lawsuit by Mr. Jones against the City as a
27 vehicle to quickly settle all existing LADWP-billing-related claims
28

Defendant's initials: _P.M._   2

against the City on the City's desired terms.  In addition, it was agreed that defendant PARADIS and Kiesel would continue to prepare the City's intended lawsuit against PwC.

**B.   DEFENDANT MAKES KICKBACK AGREEMENT WITH OHIO ATTORNEY**

6.   On or about February 25, 2015, in furtherance of the agreed-upon white knight strategy, defendant PARADIS contacted an Ohio attorney ("Ohio Attorney") with whom he was acquainted and asked Ohio Attorney to play the role of the attorney representing Mr. Jones in the lawsuit against the City ("*Jones v. City*").  Defendant PARADIS informed Ohio Attorney of his understanding that the City wanted the case "pre-settled" on the City's desired terms.  Defendant PARADIS told Ohio Attorney that defendant PARADIS would do all or most of the work in the case, and that in exchange, defendant PARADIS wanted twenty percent of Ohio Attorney's fees as a kickback.  Ohio Attorney agreed to this arrangement.  By this scheme, defendant PARADIS intended to defraud 1) Mr. Jones and LADWP ratepayers of their right to the honest services of Ohio Attorney, and 2) the citizens of the City of Los Angeles of their right to defendant PARADIS's honest services, and he did so knowing that it was illegal.

7.   Defendant PARADIS and Ohio Attorney agreed that, because defendant PARADIS understood that the City did not intend for this lawsuit to be adversarial and wanted this lawsuit to be resolved as quickly as possible on the terms desired by the City, Ohio Attorney would refrain from demanding any discovery or filing any adversarial motions against the City.

8.   Defendant PARADIS and Ohio Attorney, among others, agreed that Ohio Attorney would purport to represent the interests of Mr.

Defendant's initials: _____   3

1  Jones and the class of LADWP ratepayers in filing and prosecuting a
2  class action lawsuit.  However, as defendant PARADIS knew and
3  intended, Ohio Attorney would instead guide the lawsuit toward a
4  rapid and preordained settlement orchestrated by the City on the
5  terms desired by the City, with no attorney fulfilling the ethical
6  duty to represent the best interests of Mr. Jones or the class of
7  LADWP ratepayers through a true adversarial process.
8       9.  Defendant PARADIS and Ohio Attorney agreed that to conceal
9  defendant PARADIS's involvement in the *Jones v. City* lawsuit, Ohio
10  Attorney would sign the correspondence and filings that defendant
11  PARADIS drafted.  Defendant PARADIS knew and intended that by these
12  actions, Ohio Attorney would impliedly and falsely represent that he
13  was independently litigating the matter and conducting the
14  investigation into the merits of a potential settlement with the goal
15  of obtaining the best result for his client.  In fact, as defendant
16  PARADIS at all times knew, Ohio Attorney did not do any of those
17  things and instead relied heavily on defendant PARADIS's work product
18  and representations.
19       10.  Defendant PARADIS, Ohio Attorney, and others agreed that to
20  further conceal from, among others, the court, the mediator, and Mr.
21  Jones, the collusive nature of the *Jones v. City* settlement,
22  defendant PARADIS and Ohio Attorney would engage in multiple sham
23  mediation sessions with the City, wherein they would act as though
24  each side was zealously advocating for the interests of its
25  respective client, even though, in fact, defendant PARADIS knew that
26  the key terms of the class settlement had already been substantively
27  agreed upon by the City and Ohio Attorney on behalf of the class
28

Defendant's initials: _____  4

1   prior to the first mediation.

2       11.  Defendant PARADIS and Ohio Attorney agreed that they would

3   each endeavor to ensure that Ohio Attorney was awarded as much money

4   in attorney's fees as possible, because they understood and intended

5   that doing so would financially benefit them both.  To ensure that

6   the court would award Ohio Attorney and his firm the highest attorney

7   fees award possible, Ohio Attorney submitted, at defendant PARADIS's

8   direction, billing records to the court falsely indicating that he

9   began working on *Jones v. City* as early as November 2014 and spent

10  hundreds of hours drafting the complaint, conducting discovery, and

11  engaging in strategy and analysis.  In fact, as defendant PARADIS

12  then knew, Ohio Attorney only learned of the opportunity to represent

13  Mr. Jones on February 25, 2015, did not conduct any discovery, and

14  did not engage in any legitimate strategy or analysis because members

15  of the City Attorney's Office and defendant PARADIS had already

16  decided on the key terms of settlement.

17      12.  Defendant PARADIS and Ohio Attorney agreed that they, among

18  others, would conceal from the court, the mediator, and Mr. Jones the

19  collusion — including defendant PARADIS's work on behalf of Ohio

20  Attorney, the lack of an independent attorney representing the

21  ratepayers' interests in the adversarial process, and the

22  orchestrated nature of the settlement — from, among others, the

23  court overseeing the litigation, Mr. Jones, other class action

24  plaintiffs whose claims would be forcibly resolved pursuant to the

25  City's orchestrated settlement, counsel for other class action

26  plaintiffs, the mediator that was used to guide the *Jones v. City*

27  case toward settlement, LADWP ratepayers, City residents, and the

28

Defendant's initials: ⟍⟋⟍   5

public.

### C. DEFENDANT REPRESENTS CITY AGAINST PwC, AND SIMULTANEOUSLY PREPARES RELATED LAWSUIT AGAINST CITY

13.   On March 6, 2015, the City filed a civil lawsuit against PwC ("*City v. PwC*"), which generally alleged that PwC was responsible for LADWP's billing problems.  Defendant PARADIS and Kiesel represented the City in that action for approximately four years, before resigning at the City's request on March 6, 2019.

14.   Because defendant PARADIS knew that the plan to find another lawyer to putatively represent his ratepayer client in a lawsuit against the City for purposes of facilitating a rapid settlement on the City's terms had been directed and authorized by at least one senior member of the City Attorney's Office, defendant PARADIS did not hide, and made no attempts to hide, the City's plan from other members of the City Attorney's Office.  In or around late February or March of 2015, defendant PARADIS advised multiple members of the City Attorney's Office that an Ohio attorney with whom he had previously worked would soon be filing a new class action lawsuit to serve as a vehicle for the City to quickly settle all LADWP billing claims against the City on the terms the City desired.  Defendant PARADIS also sent a draft of the *Jones v. City* complaint to at least one member of the City Attorney's Office for review and feedback before it was filed.

15.   During March of 2015, pursuant to the agreed-upon white knight strategy, defendant PARADIS, using nonpublic information provided to him by members of the City Attorney's Office and LADWP, drafted a detailed complaint for a class action lawsuit against the City with Mr. Jones as the named class representative.  The complaint

Defendant's initials:    6

1  bore the distinctive name of the same plaintiff — Antwon Jones —
2  whom members of the City Attorney's Office had learned in December
3  2014 that defendant PARADIS represented in connection with the LADWP
4  billing debacle.  The *Antwon Jones v. City* complaint also contained
5  voluminous nonpublic information that LADWP and the City Attorney's
6  Office had provided to defendant PARADIS, and it was substantially
7  similar to the draft *Antwon Jones v. PwC* complaint that defendant had
8  circulated to members of the City Attorney's Office for review and
9  feedback at their direction in the preceding months.
10      16.   During March of 2015, pursuant to the agreed-upon white
11  knight strategy, defendant PARADIS, using nonpublic information
12  provided to him by members of the City Attorney's Office and LADWP,
13  drafted a detailed settlement demand letter for the *Jones v. City*
14  case and provided it to Ohio Attorney to be served on the City after
15  filing the complaint.
16      17.   On March 26, 2015, defendant PARADIS introduced his client,
17  Mr. Jones, to Ohio Attorney, misleadingly informing Mr. Jones that
18  Ohio Attorney would be another attorney working on his case and
19  intentionally omitting the salient fact that defendant PARADIS
20  represented the City in a matter related to the LADWP billing system.
21  In doing so, defendant PARADIS concealed from Mr. Jones the fact that
22  defendant PARADIS was by then also representing the City — Mr.
23  Jones's intended litigation opponent — in a matter related to the
24  intended litigation as well as the fact of his collusion with Ohio
25  Attorney in connection with Mr. Jones's intended lawsuit.
26      18.   On March 26, 2015, defendant PARADIS provided the draft
27  *Jones v. City* complaint to Ohio Attorney for filing.  Defendant
28

Defendant's initials:  ⋀⋅⋀ ⋀           7

1  PARADIS directed Ohio Attorney to file the complaint by April 1,
2  2015, in order to preempt settlement efforts then being pursued by
3  the City's class action counsel with another class action plaintiff.
4  Defendant PARADIS did so on the understanding that the City wanted to
5  use Ohio Attorney and Mr. Jones to settle the cases quickly on the
6  City's terms.  Defendant PARADIS also did so with the knowledge that
7  the intended settlement with Ohio Attorney would secretly benefit
8  defendant PARADIS financially.

9      **D.   DEFENDANT ARRANGES FOR FILING OF LAWSUIT AGAINST CITY,
        WHICH IMMEDIATELY BECOMES VEHICLE FOR CITY'S DESIRED
10       SETTLEMENT**

11      19.  On or about April 1, 2015, at defendant PARADIS's direction
12  and pursuant to the white knight strategy, Ohio Attorney caused the
13  *Antwon Jones v. City* complaint that defendant PARADIS had drafted to
14  be filed in Los Angeles County Superior Court.  The complaint was
15  substantially similar to the draft *Antwon Jones v. PwC* complaint that
16  defendant PARADIS had circulated to City Attorney's Office personnel
17  in the preceding months, and it contained voluminous nonpublic LADWP
18  information that the City Attorney's Office and LADWP had provided to
19  defendant PARADIS.

20      20.  On or about April 2, 2015, at defendant PARADIS's
21  direction, Ohio Attorney sent to the City a detailed settlement
22  demand letter on behalf of Mr. Jones that defendant PARADIS had
23  drafted.

24      21.  Between on or about June 11, 2015, and on or about July 31,
25  2015, and again on October 31, 2016, defendant PARADIS and others on
26  behalf of the City participated in confidential mediation sessions
27  with Ohio Attorney.  With defendant PARADIS's knowledge and

28

Defendant's initials: _____   8

1   acquiescence, Ohio Attorney instructed his client, Mr. Jones, not to

2   attend the mediation sessions, so that Mr. Jones would not learn that

3   defendant PARADIS — whom Mr. Jones still believed was representing

4   him in his lawsuit against the City — was participating on behalf of

5   the City.

6        22.   In accordance with the agreement between defendant PARADIS

7   and Ohio Attorney, and in fulfillment of the City's stated intent to

8   settle all claims globally with a malleable opposing counsel, or

9   "white knight," the mediation sessions were largely performative,

10  with the general terms of settlement understood by both sides from

11  the outset.   Defendant PARADIS played an important role on behalf of

12  the City in all mediation sessions in the *Jones v. City* case, despite

13  not being counsel of record for the City in that matter, and he and

14  others intentionally ensured that the mediation sessions appeared to

15  reflect legitimate adversity between the parties where, in fact,

16  there was no actual adversity.

17       **E.   DEFENDANT AND OHIO ATTORNEY WORK TOGETHER TO INCREASE
          PLAINTIFF ATTORNEY FEES FOR THEIR MUTUAL FINANCIAL BENEFIT**

18

19       23.   On or about August 17, 2015, at defendant PARADIS's

20  direction, Ohio Attorney filed an amended complaint in *Jones v. City*

21  that included additional factual allegations intended to aid the

22  City's case against PwC.   Defendant PARADIS directed Ohio Attorney to

23  do so in part because the original complaint did not encompass all

24  claims asserted by other classes against the City, as contemplated by

25  the City's white knight strategy.   These amendments to the complaint

26  had the impact of increasing the settlement, and thus increasing Ohio

27  Attorney's fees.

28       24.   On or about August 17, 2015, with defendant PARADIS's

Defendant's initials:  9

1  knowledge and support, Ohio Attorney moved for preliminary approval

2  of the settlement terms to which he and the City had agreed.  This

3  preliminary settlement included approximately $13,000,000 in attorney

4  fees.  Defendant PARADIS knew that, pursuant to his agreement with

5  Ohio Attorney, he would receive twenty percent of Ohio Attorney's

6  share of that fee award.

7        25.   Thereafter, with defendant PARADIS's knowledge and support,

8  Ohio Attorney asked the City for more attorney fees.  The increase in

9  attorney fees also increased defendant PARADIS's own secret financial

10  benefit from the settlement.  On or about May 5, 2017, Ohio Attorney

11  filed a declaration containing a demand for approximately $19,000,000

12  in attorney fees.  In support of his demand, Ohio Attorney falsely

13  attested to work that he had purportedly performed on the case, when,

14  in fact, both Ohio Attorney and defendant PARADIS knew that defendant

15  PARADIS had performed much of the work for which Ohio Attorney was

16  demanding compensation.  Defendant PARADIS concealed from the court,

17  Mr. Jones, and others the fact of his own performance of Ohio

18  Attorney's work in order to make the *Jones v. City* case look like an

19  adversarial lawsuit, when in fact the plaintiff's lawyer was acting

20  at the control and direction of a lawyer acting on behalf of the

21  defendant throughout the entirety of the litigation.

22        26.   On July 20, 2017, relying on false representations by Ohio

23  Attorney and others that defendant PARADIS knew to be false, the Los

24  Angeles Superior Court judge overseeing the *Jones v. City* matter

25  granted final approval to the parties' requested settlement, which

26  contained terms awarding approximately $19,000,000 in plaintiff

27  attorney fees, of which approximately $10,300,000 was awarded to Ohio

28

Defendant's initials: _____ 10

1   Attorney.

2         F.   **DEFENDANT SECRETLY OBTAINS $2,175,000 KICKBACK FROM OHIO**
3              **ATTORNEY, WHICH IS CONCEALED THROUGH SHELL COMPANIES**

4         27.   By the terms of defendant PARADIS's secret kickback
5   agreement with Ohio Attorney, defendant PARADIS was to receive twenty
6   percent of Ohio Attorney's fees in the *Jones v. City* case.   Pursuant
7   to this agreement, defendant PARADIS and Ohio Attorney determined
8   that defendant PARADIS would receive a kickback of $2,175,000.

9         28.   In July of 2017, defendant PARADIS reminded Ohio Attorney
10  of their prior agreement whereby Ohio Attorney would pay a kickback
11  of twenty percent of his attorney fee share to defendant PARADIS.
12  Ohio Attorney again agreed to fulfill his end of the deal.   Defendant
13  PARADIS and Ohio Attorney discussed and agreed that they would each
14  form a shell company to facilitate and conceal the kickback payment,
15  which they both knew needed to be concealed because it was illegal.

16        29.   On November 1, 2017, in furtherance of his agreement with
17  Ohio Attorney, defendant PARADIS created S.M.A. Property Holdings,
18  LLC, a shell company that he and Ohio Attorney intended to use to
19  transfer and conceal Ohio Attorney's illegal kickback to defendant
20  PARADIS.   While the operating agreement for S.M.A. Property Holdings,
21  LLC, expressly stated that the entity's "mission" was "to create a
22  portfolio of income-producing assets that will appreciate in value
23  over a three to five year time horizon," defendant PARADIS never put
24  such assets into the company, because it was not in fact a legitimate
25  investment company and was intended only to transfer and conceal the
26  illegal kickback payment.

27        30.   On November 10, 2017, pursuant to his kickback agreement
28  with defendant PARADIS, Ohio Attorney secretly paid and caused to be

Defendant's initials: _____   11

1  paid $2,175,000 to defendant PARADIS.  Ohio Attorney transferred the

2  funds through a shell company, Tarten Investments, Inc., which he had

3  set up for that purpose, to defendant PARADIS via the S.M.A. Property

4  Holdings, LLC, shell company.  Both defendant PARADIS and Ohio

5  Attorney intended for this transfer of funds to appear to be a

6  legitimate real estate investment, when both knew that it was not,

7  and that instead, it was a means to conceal the illegal kickback.

8  **II.  DEFENDANT PARADIS'S CRIMINAL OFFENSES RELATED TO THE COLLUSIVE
       LITIGATION SCHEME**

9

10     **A.    CONSPIRACY**

11     31.  As described herein, beginning on or about February 25,

12  2015, and continuing through on or about November 10, 2017, defendant

13  PARADIS knowingly and willfully conspired with Ohio Attorney and

14  others to knowingly and intentionally commit honest services fraud,

15  wire fraud and mail fraud.

16     **B.    HONEST SERVICES WIRE AND MAIL FRAUD**

17     32.  As described herein, beginning on or about February 25,

18  2015, and continuing through at least on or about November 10, 2017,

19  in Los Angeles County, within the Central District of California, and

20  elsewhere, defendant PARADIS knowingly and with intent to defraud,

21  devised, participated in, and executed a scheme to defraud LADWP

22  ratepayers and the City of Los Angeles and its residents as to

23  material matters, including:

24        a.    By depriving Mr. Jones and LADWP ratepayers of their

25  right to the honest services of Ohio Attorney, namely, the honest

26  performance of Ohio Attorney's fiduciary duties as class counsel on

27  behalf of Mr. Jones and LADWP ratepayers in a class action against

28  LADWP free from conflicts of interest, self-enrichment, self-dealing,

Defendant's initials:  12

1  concealment, deceit, fraud, and kickbacks;

2          b.  By depriving the citizens of the City of Los Angeles
3  and ratepayers of LADWP of their right to the honest services of
4  defendant PARADIS, namely, the honest performance of defendant
5  PARADIS's fiduciary duties as an authorized representative of the
6  City of Los Angeles and LADWP in connection with the *Jones v. City*
7  litigation free from conflicts of interest, self-enrichment, self-
8  dealing, concealment, deceit, fraud, and kickbacks; and

9          c.  By depriving Mr. Jones of his right to the honest
10 services of defendant PARADIS, namely, the honest performance of
11 defendant PARADIS's fiduciary duties as counsel to Jones free from
12 conflicts of interest, self-enrichment, self-dealing, concealment,
13 deceit, fraud, and kickbacks.

14     33.  Defendant PARADIS did so with the intent to obtain money
15 and property by means of materially false and fraudulent pretenses,
16 representations and promises, to wit, by using Ohio Attorney's
17 position as class counsel to enrich defendant PARADIS through the
18 procurement of a $10,300,000 attorney's fee award for Ohio Attorney
19 in exchange for the orchestrated settlement of *Jones v. City*, and
20 broad release of claims against the City of Los Angeles, through a
21 $2,175,000 kickback from Ohio Attorney to defendant PARADIS, and
22 through the concealment of material information, which violation was
23 effected by defendant PARADIS's use, and cause of others' use, of the
24 mails and wire communications in interstate commerce, including the
25 following items:

26          a.  On March 26, 2015, a draft complaint sent via email
27 from defendant PARADIS in Los Angeles, California, to Ohio Attorney

28

Defendant's initials:  13

1  in Cleveland, Ohio.

2          b.   On May 5, 2017, a Notice of Unopposed Motion and

3  Motion for Final Approval of Class Action Settlement and Award of

4  Attorneys' Fees, Costs and Service Awards, electronically filed by

5  Ohio Attorney's law firm in Cleveland, Ohio, with the Los Angeles

6  County Superior Court.

7          c.   On October 19, 2017, transfer by Ohio Attorney of

8  $1,468,740.55 to Tarten Investment, Inc.

9          d.   On November 10, 2017, transfer by Ohio Attorney of

10  $2,175,000 from Tarten Investment, Inc., via a bank in Ohio, to

11  defendant PARADIS using S.M.A. Property Holdings, LLC, via a bank in

12  Delaware.

13     34.   In addition, for the purpose of executing this scheme to

14  defraud, defendant PARADIS and Ohio Attorney caused the following

15  item, among others, to be placed in an authorized depository for mail

16  matter to be sent and delivered by the United States Postal Service

17  or by any private or commercial interstate carrier:

18          a.   On July 28, 2017, a check from the City of Los Angeles

19  to Ohio Attorney for $19,241,003.99, sent and delivered by Federal

20  Express.

21  **III. THE AVENTADOR BRIBERY SCHEME**

22      **A.   DEFENDANT PARADIS'S FIRST CONTRACT WITH LADWP**

23     35.   Through his work as Special Counsel, which involved

24  investigating, filing, and litigating the *City v. PwC case*, defendant

25  PARADIS developed specialized knowledge regarding LADWP's billing

26  system.

27     36.   On or about October 19, 2015, LADWP's five-person Board of

28

Defendant's initials:  14

Commissioners (the "LADWP Board") awarded a one-year, approximately $1,304,090 no-bid contract to defendant PARADIS's law firm, the Paradis Law Group, PLLC ("PLG"), to provide project management services in connection with LADWP's billing system remediation.

37.    On or about May 23, 2016, the LADWP Board extended PLG's project management services contract for another year and awarded PLG an additional $4,725,675.

**B.    DEFENDANT PARADIS BEGINS GHOSTWRITING THE INDEPENDENT MONITOR'S REPORTS**

38.    In or around December 2015, the Los Angeles Superior Court judge overseeing the *Jones v. City* lawsuit appointed an Independent Monitor ("Independent Monitor") to oversee LADWP's performance under the Settlement Agreement in that case, which required LADWP to remediate its billing system and meet various benchmarks over a specific period of time, among other obligations.

39.    During the course of Independent Monitor's court-appointed tenure to deliver objective and unbiased reports, defendant PARADIS and Independent Monitor formed a personal relationship.  Over the course of that relationship and during the independent monitorship, defendant PARADIS treated Independent Monitor to sporting events, as well as meals and drinks, on multiple occasions.

40.    As part of Independent Monitor's duties, the court required Independent Monitor to file periodic reports with the court describing, among other things, LADWP's progress in meeting its remediation obligations and the benchmarks contained in the *Jones v. City* Settlement Agreement.  With the knowledge and approval of multiple LADWP officials and employees, among others, defendant PARADIS drafted nearly all of Independent Monitor's reports to the

Defendant's initials: ⟨⟨⟨⟨  15

court.  Specifically, defendant PARADIS would circulate drafts of the reports to Independent Monitor and others and then incorporate edits before Independent Monitor signed the reports and had them filed with the court.

**C. DEFENDANT FORMS A PERSONAL RELATIONSHIP WITH LADWP GENERAL MANAGER AND THEY BEGIN PLANNING FOR A FUTURE LADWP CONTRACT**

41. Through his involvement in the *City v. PwC* case and providing project management services for LADWP's billing system, defendant PARADIS formed a close working and personal relationship with the General Manager of LADWP ("LADWP General Manager"), an agent of LADWP. Defendant PARADIS and LADWP General Manager traveled together for work and personal purposes, attended concerts and other events together, and dined together at expensive restaurants. Defendant PARADIS regularly paid for LADWP General Manager at these outings.

42. During the course of defendant PARADIS's remediation work for LADWP, defendant PARADIS, LADWP General Manager, and others at LADWP learned about certain cyber-security vulnerabilities that posed potential threats to LADWP's network, computer systems, and/or operations. After learning about these vulnerabilities, defendant PARADIS, LADWP General Manager, and others at LADWP discussed the possibility that defendant PARADIS could expand his work for LADWP to include cyber-related services to address these vulnerabilities.

43. In or around early 2017, defendant PARADIS determined that, as a law firm, PLG could not provide future remediation or other services for LADWP based on state bar rules prohibiting PLG from providing non-legal services. Defendant PARADIS and LADWP General Manager discussed and agreed that, in order for defendant PARADIS to

Defendant's initials:  16

1   provide future remediation and other services to LADWP, including

2   cyber-security services, defendant PARADIS would need to form a new

3   company that could contract with LADWP in place of PLG.  Thereafter,

4   with the knowledge and authorization of LADWP General Manager and

5   others at LADWP, defendant PARADIS created a new company known as

6   Aventador Utility Solutions, LLC ("Aventador") that would secure

7   contracts with LADWP.

8       **D.**    **DEFENDANT PARADIS AGREES TO GIVE LADWP GENERAL MANAGER A
9   FUTURE JOB, MILLION-DOLLAR SALARY, AND COMPANY CAR IN
    EXCHANGE FOR LADWP GENERAL MANAGER'S HELP SECURING A
10  LUCRATIVE CONTRACT FOR AVENTADOR**

11      44.  On or about February 10, 2017, defendant PARADIS met

12  privately with LADWP General Manager at a hotel in Riverside,

13  California.  During this meeting, defendant PARADIS and LADWP General

14  Manager discussed the fact that defendant PARADIS was forming

15  Aventador and the fact that they intended for Aventador to secure a

16  lucrative no-bid contract with LADWP that would include, among other

17  work, continued remediation services as well as cyber-related

18  services.  Defendant PARADIS and LADWP General Manager went on to

19  discuss ways that LADWP General Manager could benefit financially

20  from Aventador.  Specifically, defendant PARADIS and LADWP General

21  Manager agreed that LADWP General Manager would work to ensure that

22  the LAWDWP Board awarded a contract to Aventador.  In exchange,

23  defendant PARADIS and LADWP General Manager agreed that LADWP General

24  Manager would receive, among other benefits: (1) the title of Chief

25  Executive Officer ("CEO") of Aventador upon LADWP General Manager's

26  retirement from LADWP; (2) an approximately $1,000,000 annual salary

27  upon joining Aventador; and (3) a new Mercedes SL 550 as LADWP

28  General Manager's company car.  At various points, LADWP General

Defendant's initials: _____ 17

1   Manager and defendant PARADIS also discussed a possible signing bonus

2   for LADWP General Manager.

3        45.   On or about March 28, 2017, defendant PARADIS registered

4   Aventador with the California Secretary of State.  In subsequent

5   discussions in or around spring 2017, defendant PARADIS and LADWP

6   General Manager agreed that Aventador would pursue, and LADWP General

7   Manager would work to ensure, a no-bid contract with LADWP valued at

8   approximately $30,000,000.  The LADWP Board was scheduled to vote on

9   the $30,000,000 no-bid Aventador contract on June 6, 2017.

10       **E.   DEFENDANT PARADIS WRITES A REPORT FOR THE INDEPENDENT
              MONITOR PADDED WITH CRITICAL SUPPORT FOR THE AVENTADOR**

11       **CONTRACT**

12       46.   In or around early May of 2017, as had become his practice,

13   defendant PARADIS drafted the next periodic court report for

14   Independent Monitor.  Defendant PARADIS's primary goal in drafting

15   this report was to provide LADWP General Manager with support for the

16   LADWP Board's vote to award the $30,000,000 no-bid contract to

17   Aventador.  Defendant PARADIS discussed this strategy with LADWP

18   General Manager, and LADWP General Manager reviewed and authorized

19   the language that defendant PARADIS included in the report for the

20   court.

21       47.   On or about May 5, 2017, Independent Monitor's report was

22   filed with the court in the *Jones v. City* case.  Section IV of the

23   report, which defendant PARADIS drafted specifically to include

24   talking points for LADWP General Manager to present to the LADWP

25   Board in support of the Aventador contract, stated, among other

26   things, that LADWP: was grossly understaffed in the Information

27   Technology ("IT") area; had difficulty hiring IT staff; lacked well-

28   

Defendant's initials: _____ '18

1  qualified IT project management personnel; and lacked the ability to

2  successfully manage large-scale IT implementation projects.  The

3  report went on to state that, because of these deficiencies, LADWP

4  needed to procure these services through an outside vendor.

5      **F.  DEFENDANT PARADIS AND LADWP GENERAL MANAGER WORK TO ENSURE
          THE LADWP BOARD'S SUPPORT FOR THE AVENTADOR CONTRACT**

6

7      48.  In or around May of 2017 and early of June 2017, defendant

8  PARADIS worked with LADWP General Manager together to position

9  Aventador to secure the $30,000,000 no-bid contract with LADWP.

   These efforts included, among other things: editing drafts of a

10 letter that was ultimately sent to the LADWP Board summarizing the

11

   purpose and terms of the proposed Aventador contract and explaining

12 why alternatives to awarding the contract on a no-bid basis were

13

   unsatisfactory; preparing and refining LADWP General Manager's oral

14 and written presentation to the LADWP Board touting the Aventador

15

   contract; strategizing to remove impediments to Aventador receiving

16 the contract; and omitting defendant PARADIS's ownership of Aventador

17

   from LADWP General Manager's oral and written presentation.

18

19     49.  On June 6, 2017, the LADWP Board met to consider the

   Aventador contract, among other items.  During his presentation to

20 the LADWP Board immediately before the vote, LADWP General Manager

21

   cited the verbiage of the May 5, 2017 Independent Monitor report

22 drafted by defendant PARADIS, told the LADWP Board that LADWP could

23

   not meet its obligations under the *Jones v. City* settlement agreement

24 unless it contracted with Aventador, and conveyed a sense of urgency

25

   to approve the Aventador contract.  LADWP General Manager did not

26 disclose to the LADWP Board, either during the meeting on or about

27

   June 6, 2017, or at any other point, that LADWP General Manager had

28

Defendant's initials:  _J.M._  19

1   solicited, and defendant PARADIS had agreed to give LADWP General

2   Manager, an annual salary of approximately $1,000,000, a luxury

3   company Mercedes, and the title of Aventador's CEO once LADWP General

4   Manager retired from LADWP.

5       50.   Certain members of the LADWP Board were acutely interested

6   in issues relating to LADWP's cybersecurity during that time period.

7   It was defendant PARADIS's understanding that those LADWP Board

8   members intended for the Aventador contract to focus significantly on

9   cybersecurity, notwithstanding their public-facing comments focusing

10  on Aventador's planned remediation work pursuant to the *Jones v. City*

11  settlement.

12      51.   Following LADWP General Manager's presentation, the LADWP

13  Board voted unanimously to award Aventador a three-year, $30,000,000

14  no-bid contract.

15      **G.   LADWP BOARD MEMBER SOLICITS UNPAID LEGAL SERVICES FROM
           DEFENDANT PARADIS AND HIS LAW FIRM IN EXCHANGE FOR HIS

16         SUPPORT OF THE CONTRACT, AND DEFENDANT PARADIS AGREES**

17      54.   One member of the LADWP Board ("LADWP Board Member") was

18  initially supportive of the Aventador contract.  However, in the

19  weeks before the scheduled June 6, 2017 LADWP Board vote on the

20  Aventador contract, and in particular over the weekend of June 3-4,

21  2017, LADWP Board Member, an agent of LADWP, expressed to other LADWP

22  officials and employees, including LADWP General Manager, his

23  reluctance to support the Aventador contract.

24      55.   At the end of May of 2017, approximately one week before

25  the LADWP Board was set to vote on defendant PARADIS's $30,000,000

26  no-bid contract, LADWP Board Member began communicating with

27  defendant PARADIS about an unrelated litigation matter.

28

Defendant's initials: _____   20

1   56.   As the June 6, 2017 Board meeting approached, LADWP Board
2   Member continued to communicate with defendant PARADIS about LADWP
3   Board Member's other lawsuit and solicited, among other things,
4   information about the judge handling the matter and various pleadings
5   and legal documents to use in his lawsuit.   Knowing that LADWP Board
6   Member would soon vote on the Aventador contract, and intending to
7   gain favor with LADWP Board Member so that he would support the
8   contract, defendant PARADIS provided some of the information and
9   materials that LADWP Board Member requested at that time, and agreed
10  to provide additional requested materials.

11   57.   On or about June 4, 2017, LADWP Board Member agreed to vote
12  in favor of the contract if a committee consisting of LADWP Board
13  Member and one other Board member was set up to oversee the progress
14  of the contract.   LADWP General Manager shared this information with
15  defendant PARADIS on or about the same date.

16   58.   On the morning of June 6, 2017, the LADWP Board met to
17  consider and vote on various agenda items, including the Aventador
18  contract.   Shortly before LADWP Board Member entered the Board
19  meeting room, defendant PARADIS encountered LADWP Board Member in the
20  hallway at LADWP.   During their brief meeting, LADWP Board Member
21  expressed his appreciation for defendant PARADIS's assistance with
22  his other legal matter and said to defendant PARADIS words to the
23  effect that, "You take care of me, I take care of you."   Defendant
24  PARADIS understood LADWP Board Member to mean that LADWP Board Member
25  would vote in favor of the Aventador contract if defendant PARADIS
26  continued to provide LADWP Board Member with unpaid legal services
27  and assistance.

28

Defendant's initials: _____ 21

1       59.   On June 6, 2017, hours after the LADWP Board approved

2   defendant PARADIS's $30,000,000 no-bid Aventador contract, LADWP

3   Board Member sent defendant PARADIS the email address of LADWP Board

4   Member's colleague.   Later that day, defendant PARADIS emailed to the

5   colleague various legal documents that LADWP Board Member had

6   previously solicited.

7       60.   Throughout in or around June 2017 until early August 2017,

8   defendant PARADIS and Paradis Law Partner continued to perform legal

9   work on LADWP Board Member's legal matter, pursuant to defendant

10   PARADIS's understanding of their tacit agreement that defendant

11   PARADIS would provide legal services to LADWP Board Member in

12   exchange for LADWP Board Member's vote on the Aventador contract.

13       61.   On or about June 15, 2017, defendant PARADIS relayed to

14   LADWP General Manager that LADWP Board Member had been repeatedly

15   contacting him, including about LADWP Board Member's legal matter.

16   LADWP General Manager replied by advising defendant PARADIS that

17   LADWP Board Member had been appointed for another four years on the

18   LADWP Board, indicating that defendant PARADIS should assist LADWP

19   Board Member so that they would have LADWP Board Member's support on

20   the ongoing Aventador contract as well as future Aventador- and

21   LADWP-related matters.

22       62.   In total, beginning approximately a week before the LADWP

23   Board vote on the Aventador contract, defendant PARADIS and Paradis

24   Law Partner collectively performed approximately thirty-six hours of

25   legal work for LADWP Board Member, which defendant PARADIS valued at

26   over $30,000 based on their respective billing rates.   Defendant

27   PARADIS did not seek payment for this work from LADWP Board Member,

28

Defendant's initials: _/\\_. _/\\_ _/\_ 22

1  nor did LADWP Board Member offer payment.

2      63.   Defendant PARADIS performed this unpaid legal work, and

3  directed Paradis Law Partner to also perform unpaid legal work, on

4  LADWP Board Member's legal matter both because LADWP Board Member had

5  voted to award the Aventador contract with the understanding that

6  defendant PARADIS would provide these services, and because defendant

7  PARADIS wanted to influence LADWP Board Member and remain in LADWP

8  Board Member's favor for purposes of future Board actions on his

9  contract.

10     **H.   DEFENDANT PARADIS AND LADWP GENERAL MANAGER EXPAND THEIR
         AVENTADOR PLANS**
11

12     64.   In May of 2018, LADWP General Manager and other LADWP

13  officials and employees, along with defendant PARADIS, joined a

    delegation on a visit to Israel.  During the trip, defendant PARADIS
14
    and LADWP General Manager met with officials from a global company
15
    that provided cybersecurity training to governmental and business
16
    organizations ("Cyber Company").  Cyber Company had franchises in the
17
    United States and abroad, and defendant PARADIS and LADWP General
18
    Manager decided to invest in bringing a Cyber Company facility to Los
19
    Angeles.  Defendant PARADIS and LADWP General Manager agreed that
20
    defendant PARADIS would put up $5,000,000 in capital and would have a
21
    controlling interest, and that LADWP General Manager would have an
22
    ownership interest.  LADWP General Manager told defendant PARADIS
23
    that LADWP would purchase five years of cybersecurity training at the
24
    franchise facility, at a cost of $3,000,000 per year.  LADWP General
25
    Manager did not have the formal authority to make this commitment on
26
    behalf of LADWP without action by the LADWP Board.  Defendant PARADIS
27
    and LADWP General Manager agreed that LADWP General Manager would use
28

Defendant's initials:  23

1  his position and influence at LADWP to convince the LADWP Board to

2  support and vote in favor of this expenditure, which both defendant

3  PARADIS and LADWP General Manager knew and intended would secretly

4  benefit them both financially.

5      65.  In January 2019, pursuant to his agreement with LADWP

6  General Manager, defendant PARADIS entered into a joint venture

7  agreement with Cyber Company wherein defendant PARADIS agreed to pay

8  $5,000,000 to open a Cyber Company facility in Los Angeles that would

9  provide training to LADWP employees.

10      66.  During the events described herein, LADWP received federal

11  funds and benefits in excess of $10,000 annually.

12  **IV.   DEFENDANT PARADIS'S CRIMINAL OFFENSES RELATED TO THE AVENTADOR
     BRIBERY SCHEME**

13

14      **A.    CONSPIRACY**

15      67.  Beginning on or about February 15, 2017, and continuing

16  through on or about March 6, 2019, defendant PARADIS knowingly and

17  willfully conspired and agreed with LADWP General Manager and others

18  to knowingly and intentionally commit honest services wire fraud and

19  federal program bribery.

     **B.    HONEST SERVICES FRAUD**

20

21      68.  Beginning in or around February of 2017, defendant PARADIS

22  and LADWP General Manager, knowingly and with intent to defraud,

23  devised, participated in, and executed a scheme to defraud LADWP

24  ratepayers as to material matters, including by depriving LADWP

25  ratepayers of their right to the honest services of LADWP General

26  Manager and LADWP Board Member.

27      69.  Defendant PARADIS did so with the intent to obtain money

28  and property by means of materially false and fraudulent pretenses,

Defendant's initials:    24

representations and promises, to wit, by using LADWP General
Manager's position as General Manager of LADWP to enrich both
defendant PARADIS and LADWP General Manager through the procurement
of a $30,000,000 no-bid LADWP contract for a company in which LADWP
General Manager had a covert financial interest and defendant PARADIS
had an overt financial interest, and through the concealment of
material information, which violation was effected by defendants
LADWP GENERAL MANAGER's and PARADIS's use, or cause of others' use,
of wire communications in interstate commerce, including the
following items:

a.   On May 4, 2017, defendant PARADIS sent via email a
draft of Independent Monitor's report, which included a section
designed to support the Aventador contract, to Independent Monitor,
blind-copying LADWP General Manager on the email.

b.   On May 25, 2017, LADWP General Manager sent an email
to defendant PARADIS with a draft of the Aventador Board Letter
designed to support a vote by the LADWP Board in favor of the
Aventador contract.

c.   On June 6, 2017, defendant PARADIS sent an email to
LADWP Board Member with legal analysis for LADWP Board Member's
litigation matter, which PARADIS provided in exchange for LADWP Board
Member's support of the Aventador contract.

d.   On June 7, 2018, LADWP General Manager sent an email
to defendant PARADIS with a draft presentation to the LADWP Board
touting Aventador's cybersecurity capabilities.

C.   **FEDERAL PROGRAM BRIBERY**

70.   Between on or about February 10, 2017, and on or about

Defendant's initials: _____   25

1  March 6, 2019, defendant PARADIS corruptly gave, offered, and agreed

2  to give something of value to LADWP General Manager, intending to

3  influence and reward him in connection with a business, transaction,

4  and series of transactions of LADWP having a value of $5,000 or more.

5  Specifically, defendant PARADIS gave, offered, and agreed to give

6  financial benefits to LADWP General Manager, including a future

7  financial interest in Aventador, the promise of a future job as the

8  CEO of Aventador with an annual salary of approximately $1,000,000,

9  and related perquisites, meals, travel, and event tickets, intending

10  to influence and reward LADWP General Manager in connection with a

11  $30,000,000 no-bid LADWP contract award to Aventador, including in:

12  (1) generating and submitting a Board Letter intended to support a

13  vote by the LADWP Board in favor of Aventador's contract; (2) meeting

14  and conferring with individual LADWP Board members to advocate on

15  behalf of the Aventador contract and solicit the Board members'

16  votes; (3) preparing and delivering a presentation to the LADWP Board

17  asserting that there were no viable alternatives to the Aventador

18  contract, that the need for Aventador's services was dire and

19  immediate, and urging the Board to vote in favor of the contract;

20  (4) exerting pressure on LADWP Board members and other LADWP City

21  officials and employees to influence the approval process of the

22  Aventador contract.

23      71.   Between on or about May 31, 2017, and on or about August

24  22, 2017, defendant PARADIS corruptly gave, offered, and agreed to

25  give something of value to a person, intending to influence and

26  reward LADWP Board Member in connection with a business, transaction,

27  and series of transactions of LADWP having a value of $5,000 or more.

28

Defendant's initials:  _____  26

1  Specifically, defendant PARADIS gave, offered, and agreed to give

2  LADWP Board Member legal services from defendant PARADIS and his law

3  firm in connection with a private civil litigation matter, intending

4  to influence and reward LADWP Board Member in connection with a

5  $30,000,000 no-bid LADWP contract award to defendant PARADIS's

6  company, Aventador, including in: (1) using his membership on the

7  LADWP Board of Commissioners to exert influence on other LADWP Board

8  members to vote in favor of the Aventador contract; (2) voting in

9  favor of the Aventador contract; and (3) using his position to exert

10  pressure on other LADWP City officials and employees to influence the

11  approval process of the Aventador contract as well as future Board

12  actions related to the Aventador contract.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's initials: _____  27